## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **HENRY BURKEY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 4829 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **MICHAEL J. ASTRUE**, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Henry Burkey (hereinafter "Burkey"), seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (hereinafter

"Commissioner"), denying him disability insurance benefits (hereinafter "DIB"). Before this

Court is Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security.

The parties have consented to have this Court conduct any and all proceedings in this case,

including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(c).

For the reasons set forth below, this Court affirms the Commissioner's decision in part, reverses

in part, and remands the case for further proceedings consistent with this opinion.


## I.  Background

### A.  Procedural History

Burkey filed for DIB on May 22, 2002, alleging that he had become disabled on

October 9, 2001.  (R. at 56-58.)  The Social Security Administration denied his application on

October 28, 2002, and Burkey filed a request for reconsideration, which was denied on January 14, 2003. (R. at 34-37, 38-39, 40-43.) Burkey filed a timely request for a hearing before an administrative law judge (hereinafter "ALJ".) (R. at 44.) ALJ John L. Mondi held a hearing on January 27, 2004 at which Burkey testified, as did his wife, Darryl Burkey. (*Id.*) Additional testimony was provided by Cheryl Hoiseth, a vocational expert (hereinafter "VE"). (R. at 370.) The ALJ denied Burkey's claim on February 11, 2005. (R. at 26.) The Appeals Council of the Social Security Administration declined Burkey's request to review the case, making the ALJ's decision the final decision of the Commissioner. (R. at 6-10.) Burkey now appeals the decision to this Court.

### B. Factual Background

#### 1. Education and Work History

Burkey was forty-five years old at the time he claims he became disabled. He is approximately six feet tall and weighs approximately 280 pounds. (R. at 56, 373.) He lives in Elgin, Illinois, with his wife. (R. at 59, 61.) His a United States citizen with no minor children. (R. at 59-60.) He attended school but did not complete the eleventh grade. (R. at 376.) At least some of his classes were special education classes. (*Id.*) He has a varied work history that begins with a period of time spent as a boxer and includes several years as a ranch hand working with thoroughbred horses, as well as a brief time as a security guard. (R. at 71, 88.) From 1989 until the time of his alleged disability Burkey worked as a machine operator. (R. at 88.)

## 2. Medical Evidence

In July 1999, Burkey injured his back at work while lifting a heavy box and visited the emergency room for treatment. (R. at 253.) In August 1999, he began physical therapy for his back, which continued until he was discharged on March 8, 2000, from physical therapy for missing appointments. (R. at 219, 144.) According to his physical therapist, as of his last appointment on February 23, 2000, Burkey was complaining of low back pain, left pelvic upslip with anterior rotation, an inability to lift himself from the floor with correct technique, and extreme tenderness of the left quadratus lumbrum area. (R. at 144.) In August 2000, he began seeing a chiropractor for his back pain. (R. at 229.) The chiropractor's initial diagnoses were facet syndrome, low back pain, thoracic pain, and muscle spasm. (R. at 229.) While continuing treatment with the chiropractor, Burkey consulted with a neurologist in October 2000 who noted that Burkey had been treated by a chiropractor "with reasonable success," but added that "pain is still a major issue." (R. at 252.) On November 24, 2000, the chiropractor noted that Burkey had "shown very slow progress to treatment" and that Burkey had been referred to Dr. Johnson, the neurologist, for further treatment. (R. at 227)

On November 27, 2000, Burkey underwent an MRI of the lumbar spine as ordered by Dr. Johnson. (R. at 245.) The MRI results indicated disk dessication in the L2/L3 and L3/L4 regions, mild to moderate diffuse bulging of the L3/L4 disk, and mild bulging of the L1/L2, L2/L3, L4/L5, and L5/S1 disks. (*Id.*) There was no evidence of disk herniation or spinal stenosis at any of these levels. (R. at 245-246.) Dr. Johnson imposed restrictions on Burkey's physical activity, limiting him to lifting a maximum of twenty pounds and ordering no lifting at all while bending forty-five degrees or more at the waist. (R. at 244.) In February 2001, Burkey requested

- 3 -

and received permission from his doctor to return to working twelve-hour shifts, but the lifting restrictions remained in place. (R. at 241.) On April 2, 2001, Dr. Johnson noted that Burkey was feeling better and that he was requesting that the lifting restriction be increased to seventy pounds. (R. at 238.) According to Dr. Johnson's notes, Burkey felt that he would "probably be OK with [the increased] limit, as long as he can rest periodically." (*Id.*)

Burkey reinjured his back on May 14, 2001, and visited Dr. Johnson the following day. (R. at 236.) According to Dr. Johnson's notes, Burkey was lifting "parts" at his place of work when he felt pain in his back that radiated to his leg. (*Id.*) Dr. Johnson also noted that, while Burkey was in a great deal of pain, he was unwilling to stay home from work for financial reasons. (*Id.*) A few days after his visit with Dr. Johnson, Burkey visited the hospital emergency room as a result of "seizures" of unknown origin. (R. at 279.) On May 21, 2001, he had a follow-up visit with a Dr. Zaremba, who noted that the cause of the seizures was unknown and that Burkey was suffering from "either true seizures or factitious seizures." (*Id.*) Dr. Zaremba referred him to a Dr. Saxena, who examined Burkey and expressed surprise that he was suddenly having so many seizures in spite of the fact that he was taking a high dose of the drug Dilantin and questioned whether the seizures Burkey was experiencing might be "pseudoseizures." (R. at 274.) On July 23, 2001, Dr. Saxena reported that Burkey was no longer having seizures but that he continued to complain of chronic back pain. (R. at 271.)

On October 9, 2001, Burkey was at work when he experienced a severe back pain. He described the pain to Dr. Saxena's office staff as being so severe that he "fell to the floor and began shaking in a manner similar to convulsions." (R. at 317.) Burkey went again to the emergency room, where tests for seizures were negative. (*Id.*) Ultimately, it emerged that the

- 4 -

"seizures" he had experienced were actually severe muscle spasms caused by back pain. (R. at 282.) Burkey underwent a diagnostic lumbar diskography ordered by Dr. Clay Frank, a neurosurgeon, on October 19, 2001, which showed "[m]ultilevel degenerative disk disease with severe pain being generated at L3-L4 greater than L4-L5 [sic]." (R. at 253.) On December 19, 2001, he visited a Dr. Levin (apparently on the recommendation of an attorney, as the report is addressed to one Daniel R. Egan, Attorney at Law) complaining of low back pain. (R. at 335.)[1] He reported that as a result of his back pain he could only sleep for one or two hours at a time, sit for thirty to sixty minutes, and stand for five minutes at a time. (Id.) He also reported a sensation of tightness in his lower back when walking and that he could only drive for one or two blocks. (Id.)

On December 23, 2001, Burkey fell down and went to the emergency room complaining of severe knee pain. (R. at 268.) He also reported at his follow-up visit with a Dr. Niccolai that he had a chronic back problem that caused his back to rapidly give out. (Id.) X-rays of his knee revealed a minimally angulated proximal tibial fracture, while the weightbearing surfaces of the knee themselves were without displacement. (Id.) Dr. Niccolai determined that Burkey's scheduled back surgery with Dr. Frank should be postponed for at least one month as a result of

[1] The final two pages of Dr. Levin's report, pages 336 and 337 in the administrative transcript, are missing from the record reviewed by the Court. The Court contacted one of the Assistant United States Attorneys associated with the case in an attempt to have the record supplemented. Approximately six weeks have elapsed and the Court has not received the missing pages. The Court has decided to resolve this case without the missing pages. First, the missing pages represent evidence tendered by Burkey, whose request for a remand we grant in this opinion. Therefore, he has not been prejudiced by the absence of the two pages. Second, neither party has relied on Dr. Levin's report in briefing the motions currently before the Court. Third, while the report is referred to in passing in the ALJ's opinion (R. at 22), the portion referred to is contained on page 335 of the record, which the Court has before it. For these reasons, the Court sees no reason to delay ruling any further while awaiting the absent pages.

his latest injury. (*Id.*) While the surgery was originally rescheduled for April 8, 2002, various problems appear to have intervened, including Burkey's failure to cease smoking preoperatively and scheduling difficulties among the doctors involved. (R. at 258, 282.) Ultimately, Burkey did undergo surgery—an L3/L4 anterior lumbar interbody fusion with Ray threaded fusion cages, right iliac crest bone graft, and L3/4 posterior instrumented fusion with Synthes Click-X—on July 1, 2002, which was performed by Dr. Frank. (R. at 293.)

On August 21, 2002, Burkey went for his first post-operative visit with Dr. Frank, who noted that Burkey's central backache symptoms were "completely gone," but noted that Burkey had some "residual stiffness" in his back that limited his ability to bend forward. (R. at 309.) Dr. Frank recommended that Burkey begin physical therapy, that he remain off of work on total temporary disability, and that he return for a follow-up visit in six weeks. (*Id.*) Dr. Frank also noted that Burkey was taking no pain medication and that none was dispensed at the appointment. (*Id.*) At Burkey's next visit, on October 2, 2002, Dr. Frank again noted "complete resolution of [Burkey's] axial back pain symptoms" and found this to be a "satisfactory early outcome," though he added that Burkey did complain of "easy fatigability as regards the paraspinal muscles when he stands for more than about 20-30 minutes." (R. at 307.) According to Dr. Frank's note, Burkey's posture was excellent but his range of motion was limited, demonstrated by his inability to touch the floor while bending forward. (*Id.*) Dr. Frank recommended temporary restrictions on the hours that Burkey could work (four per day) and the weight that he could lift (a maximum of ten pounds) but did not anticipate a need for permanent restrictions. (R. at 307-08.)

A NAL Capacity Assessment completed by Dr. Boyd E. McCracken on October 18, 2002, which projected Burkey's residual functional capacity (hereinafter "RFC") as of July 1, 2003, projected that Burkey would be able to lift and/or carry ten pounds frequently and twenty pounds occasionally. (R. at 320-21.) The assessment also projected that Burkey would be able to walk, stand, and sit for six hours in an eight-hour workday with normal breaks. (R. at 321.) Dr. McCracken noted on the assessment form that Burkey's spinal fusion surgery supported his conclusions. (*Id.*) He also projected that Burkey would be able to climb stairs or ramps, balance, stoop, kneel, and crawl on occasion, but that he would not be able to climb ladders, ropes, or scaffolds. (R. at 322.) Dr. McCracken indicated that the statements of treating physicians that were available to him did not differ significantly from his own findings, citing Dr. Frank's recommendation that Burkey be allowed to return to work for four hours per day and to lift a maximum of ten pounds. (R. at 326-27.)

On January 15, 2003, Burkey visited Dr. Frank for a six-month post-operative check. (R. at 348.) Dr. Frank noted that the "deep central nerve pain" that Burkey had suffered from prior to the surgery was gone, along with his symptoms of "lumbar instability and acute onset of spasm." (*Id.*) Burkey reported residual pain in his tailbone and coccyx when he sat for long periods of time and difficulty sleeping, though he was not taking any medications for pain. (R. at 348.) Dr. Frank concluded that Burkey had "reached the end of healing and maximum medical improvement," such that additional treatment would not improve the result. (*Id.*) On this basis, Dr. Frank found that Burkey had a "permanent partial disability rating" under Wisconsin law and placed permanent restrictions limiting lifting to ten pounds and work to four hours per day. (R. at 347-48.) He also recommended that Burkey should never bend, twist, climb, crawl, squat,

- 7 -

or kneel. (R. at 347.) Dr. Frank added, however, that these restrictions were "based on an estimate," since Burkey's insurance would not pay for a functional capacity evaluation and Burkey could not afford to pay for one himself. (R. at 348.)

## C. Burkey's Testimony

At a hearing before the ALJ on January 27, 2004, Burkey testified to his present and past employment situation as well as his symptoms and limitations affecting his ability to work. Burkey testified that he had not worked since October 9, 2001, though he said that he had "tried going out on tow trucks" once or twice per month with a relative who had a tow-truck business. (R. at 377.) While on the tow truck, Burkey testified, he was not capable of helping out with work and would "just mainly ride with him to get away." (*Id.*) As for previous work, Burkey testified to working as a machine operator prior to his disability, stating that the job required him to lift 100 pounds and that he left the job because it hurt his back. (R. at 377-78.) He also testified that his previous employer had asked him to return to work but that he had refused because he was physically incapable of doing the job they wanted him to do due to his back problems. (R. at 395.) When asked by his attorney if he had ever attempted to return and do a job that would allow him to work at a table, he replied, "No, I can't." (*Id.*)

Regarding his back surgery, Burkey testified that he had experienced some improvement but that the procedure had only been half successful, stating: "all I know is I'm in pain." (R. at 380.) He said that while the surgery had taken care of the severe pain that had caused him to experience powerful muscle spasms that were initially mistaken for seizures, he still experiences pain and smaller spasms. (R. at 380, 391.) He testified that, at the time of his hearing, he was

- 8 -

having problems with movements such as bending and twisting his back, and that he needs his wife's help to put on his shoes and socks. (R. at 380-81.) He also stated that he cannot stand or sit for very long, so that he was frequently changing positions as a result of discomfort: "I'm up and down . . . every five, 10, 20 minutes . . . I'm up and down all the time." (R. at 381.) Burkey also described difficulty moving from a sitting to a standing position, stating that it takes some time for his to get up and down and that he "moan[s] and groan[s]" a lot. (*Id.*)

With respect other physical limitations, Burkey testified he could sit for a maximum of half an hour, walk for a maximum of a quarter of a mile, lift approximately five pounds, and could not bend or crouch at all. (R. at 381-82.) He said that he used a cane "off and on" for walking. (R. at 382.) While he testified that he could stand up without needing to hold onto anything for support, he added that when his back begins "throbbing or hurting real bad" he has to stretch, estimating that he does so about twenty times per day, even in the middle of the street if necessary. (R. at 388, 384.) Burkey also stated that his back discomfort prevented him from sleeping and that he was sleeping "a couple hours" each night. (R. at 390.) On the day of the hearing, he testified, his back was "throbbing like hell," and that he could not stand without holding onto something for support and moving his leg to relieve the pressure. (*Id.*) He stated that after walking from the parking lot to the hearing room he needed to stop and stretch before he could move on. (R. at 394.)

Burkey also testified regarding his daily activities at home. He told the ALJ that he lives in a first-floor walk-up apartment. (R. at 384.) He testified that he spends most of his days watching television and "moaning and groaning." (*Id.*) With respect to household jobs, Burkey stated that he sometimes helps to wash dishes if there are not too many, and that generally this

- 9 -

requires him to stand only for about five minutes. (R. at 384, 394.) Burkey testified that he does not drive often, and only drives for short distances; he testified that he had driven his wife to the hospital but prior to that had not driven for a long time. (R. at 393.) He said that when he rides in a car as a passenger he must keep moving around and rotating, and that occasionally he has to get out of the car and stretch. (R. at 392.)

Burkey testified that, at the time of the hearing, he was not seeing a doctor regularly because the doctor had told him there was nothing more he could do. (R. at 395.) He said that he was not taking any prescription pain medication for his back, though he felt he needed it, because he did not have health insurance and did not have any money. (R. at 396.) He also stated that he was avoiding taking medication because of its adverse effects on his stomach. (R. at 382.) Burkey did say that he had taken non-prescription pain medications such as Tylenol, aspirin, and ibuprofen since his insurance had stopped paying for prescription medication. (R. at 382-83.)

Burkey further testified that his pain affected his ability to concentrate and that it made his whole body feel "weird." (R. at 396.) He also stated that he had problems with an ulcer and with his weight, but that he could not lose weight because his back pain made him unable to exercise. (R. at 397.) When asked by his attorney whether he would be able to work sitting or standing for four hours a day, Burkey replied, "I can't even sweep a floor . . . [i]t would hurt like hell," and added that when he was in pain, he would be unable to finish a job. (R. at 399-400.)

- 10 -

### D. Darryl Burkey's Testimony

Burkey's wife, Darryl Burkey, also testified at the hearing. She testified that Burkey's pain kept him awake at night and that she would often hear him and wake up. (R. at 386.) She confirmed that she helped him put on his shoes and socks. (*Id.*) Mrs. Burkey testified that, while Burkey no longer had back spasms that caused him to fall to the ground, he still complained of pain in his tailbone. (R. at 401.) With respect to household activities, Mrs. Burkey testified that she did not send Burkey on errands such as grocery shopping, but that he was able to help to carry in light-weight grocery items such as bread while she and her daughter would carry heavier items. (R. at 387.) Mrs. Burkey denied seeing Burkey lift anything heavy around the house and added that if "he lifts anything like potatoes or something, he drops them" and that "[i]t bothers him, like a sharp pain." (R. at 401.) She testified that when she was sick and unable to drive, she did have Burkey drive her to a Walgreen's store that was five minutes away. (R. at 386.) She also said that while she was recovering from her illness, Burkey would wash dishes, get her drinks, medication, and soup, but did not engage in activity that would require him to stand for any length of time. (*Id.*)

### E. The Vocational Expert's Testimony

Cheryl Hoiseth, a vocational expert (hereinafter "VE"), also testified at the hearing. She listened to the testimony by Burkey and his wife and asked Burkey several questions about his most recent job, including how long it took him to learn the job and how often he needed to lift boxes. (R. at 405.) The VE also testified that she had had the opportunity to review all of the documents in the record. (R. at 408.) The VE first classified Burkey's prior employment in

- 11 -

terms of skill and exertional levels. (*Id.*) She noted that Burkey's prior work as a security guard would be classified as light, unskilled work, but that it would usually not be included in a work summary because Burkey had held the job for only one or two months. (*Id.*) With respect to the machine operator job that Burkey had been performing prior to his injury, the VE classified it as very heavy in terms of exertion because of the amount of weight lifted and the frequency of lifting. (*Id.*) She classified the position as unskilled labor because, although there was six months of training for the job, Burkey had never completed the training. (*Id.*)

The ALJ presented the VE with several hypothetical situations and asked her to answer based on an individual with the same work experience, age, education, and reading ability as Burkey. (R. at 409.) The ALJ first asked the VE to assume that the individual had "the ability to do the lifting and carrying and standing required of light work, although subject to a limitation against any climbing of ladders, ropes or scaffolds or more than occasional stooping, kneeling, crouching, and crawling as well as climbing no ramps and stairs." (*Id.*) The VE indicated that, if the security guard position was considered to be relevant past work, then the individual would be able to return to doing that job, but that if it was not relevant past work, then the individual would not be able to return to any past work. (*Id.*) She stated that there were other jobs that a person with those limitations could be expected to perform, such as a cleaner (with approximately 10,000 jobs in the Chicagoland area), assembler (1,000 jobs) and packaging machine operator and tender (10,000 jobs.) (R. at 409-11.)

The ALJ then modified the hypothetical by adding the requirement that the individual be able to alternate sitting and standing every thirty minutes. (R. at 411.) The VE testified that this additional restriction would eliminate the assembler and packaging machine jobs, but that the

- 12 -

cleaner job remained a possibility. (*Id.*) The ALJ added the further restriction that the individual could not lift more than ten pounds or work more than four hours per day. (*Id.*) Under this scenario, the VE stated that there would be no jobs that the individual could do. (*Id.*) Finally, the ALJ asked the VE whether there would be any jobs available to Burkey if all of the testimony at the hearing were fully credited. (*Id.*) The VE answered that all work would be excluded if all of the testimony were fully credited, because "the person is up and own and not necessarily attending to an activity but attending to how to alleviate the pain," noting that Burkey had testified that he cannot bend at all and that "some bending is required for all work." (R. at 411-12.)

### F.    Consultative Physician's Post-Hearing Report

At the hearing, the ALJ indicated that he was unhappy with the lack of recent medical treatment notes, and he arranged for Burkey to be examined by a consultative physician. (R. at 415.) On May 6, 2004, Burkey was examined by Dr. Charles O'Laughlin, an orthopedic surgeon. (R. at 349.) In his report, Dr. O'Laughlin noted that Burkey complained of persistent pain in his lower back and down his left leg. (*Id.*) Burkey described the pain to Dr. O'Laughlin as severe pain akin to needles and a hot sensation, and reported that the pain was worse when he bent forward. According to Dr. O'Laughlin's report, Burkey stated that laying and sitting down also made the pain worse, and that it hurt when he had to rotate or twist his body, although sometimes this helped to relieve the pain. (*Id.*) He added that laying and stretching sometimes helped to reduce the pain, and that coughing and sneezing exacerbated it. (*Id.*) Dr. O'Laughlin also noted that Burkey complained of numbness and tingling in his left leg extending all the way to his foot,

- 13 -

as well as pain when he strained his bowel or belched. (*Id.*) Dr. O'Laughlin's report also states that Burkey reported using a cane occasionally and limping on his left leg. (R. at 350.)

Dr. O'Laughlin performed a physical examination and noted that Burkey was able to walk on both legs without using the cane. (R. at 350.) He also noted that Burkey had a slight limp on the left leg and that Burkey refused to try to walk on his heels and toes. (*Id.*) Dr. O'Laughlin reported that Burkey was able to squat, although he needed to lean on his right hand. (*Id.*) Dr. O'Laughlin found that Burkey had "basically" a negative straight leg raise at ninety degrees and a negative straight leg raise in the supine position as well. (R. at 351.) Burkey did not have a right ankle jerk reflex, but Dr. O'Laughlin found that this was the result of Burkey's failure to relax sufficiently. (*Id.*) Dr. O'Laughlin reported that Burkey had full muscle strength in his feet and ankles, good muscle strength of the knee extensors and flexors, and a normal range of motion in his hips and knees. (*Id.*) On direct examination of Burkey's back, Dr. O'Laughlin found "no detectable muscle spasm" but noted that "[Burkey] reacts with even light touch and kind of jumps with pain in an hysterical fashion." (*Id.*) Dr. O'Laughlin found no coccyx or tailbone tenderness and no sciatic notch tenderness of any significance on either side. (*Id.*)

Summarizing his findings, Dr. O'Laughlin opined that Burkey had a history of back trouble but that "on physical examination he has very little physical findings [sic] that would indicate any type of severe back condition." (R. at 351.) He noted that Burkey had negative nerve tension signs, no muscle spasms, and "no objective findings of disability." (*Id.*) Dr. O'Laughlin reported that Burkey had excellent musculature with no apparent muscle atrophy, and that he had a negative Babinski sign on both sides. (*Id.*) Dr. O'Laughlin noted that Burkey, in his opinion, was refusing to cooperate with several of the tests and that "[h]e tends to

- 14 -

exaggerate his exam and jumps inappropriately with even light palpitation." (*Id.*)

Dr. O'Laughlin concluded that "[Burkey's] objective findings do not substantiate his subjective

complaints. We see very little to treat and do not find any incapacitating condition at this time."

(*Id.*)

## II.  ALJ's Findings

In an opinion dated February 11, 2005, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.  While the record is unclear whether claimant engaged in substantial gainful activity after the alleged onset of disability (as there is no explanation for subsequent earnings posted to his record and he indicated that he worked on a tow truck only once or twice), this issue is not crucial since, in any case, the claimant is not disabled at the remaining steps of the sequential evaluation.

3.  The claimant has a "severe" medically determinable back impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4.  The claimant does not have an impairment that meets or medically equals any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding symptoms, limitations, and disability are not credible for reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity for light work (i.e., lifting up to 20 pounds occasionally and 10 pounds frequently; standing, walking and/or sitting for a total of six hours in a normal 8 hour workday with normal work breaks) subject to limitations against climbing ladders, ropes, and scaffolds; or more than occasional balancing, kneeling, stooping, crouching, crawling or climbing or ramps and stairs.

7.  The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

8.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

9.  The claimant has "a limited education" (20 CFR § 404.1564).

10. The claimant lacks transferrable skills from past relevant work (20 CFR § 404.1568).

11. Although claimant's limitations do not allow him to perform the full range of light work, jobs remain in significant numbers in the economy that he could perform, including in the Chicago metropolitan area the following jobs (and their numbers): cleaner (10,000), assembler (1,000), and packaging, machine operator, and tender (10,000), such that the claimant is not disabled within the framework of Medical-Vocational Rule 202.10 in Appendix 2.

12. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(R. at 25-26.)

## III. Discussion

### A.  Standard of Review

This Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. §405 (g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court will not reweigh the evidence or substitute its judgment for the judgment of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). However, this Court will not act as a "rubber stamp" for the Commissioner's

decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Rather, this Court must ensure

that the ALJ has articulated his analysis of the case at some minimal level. *Dixon v. Massanari*,

270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ's decision must build "an accurate

and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941. It also

requires that the ALJ "confront evidence that does not support his conclusion and explain why it

was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). If the ALJ's decision

does not meet these minimum requirements because the decision "lacks evidentiary support or is

so poorly articulated as to prevent meaningful review," this Court will reverse and remand the

decision. *Steele*, 290 F.3d at 940.


## B. The Five-Step Inquiry for Benefits Determination

In order to qualify for disability benefits, a claimant must demonstrate that she is

disabled. An individual is considered to be disabled when she is unable "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A

claimant is considered to be "unable to engage in substantial gainful activity" when she is unable

to perform her previous work or engage in any other kind of substantial work that exists in the

national economy. 42 U.S.C. § 423(d)(2)(A). In order to determine whether a claimant is

disabled under the statute, the ALJ employs a five-step inquiry:

> In the first step the ALJ considers the applicant's present work activity. Second,
> the ALJ weighs the severity of the applicant's impairment. The impairment or
> combination of impairments must severely restrict an applicant's physical or

- 17 -

mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. If not, in the fifth and final step the ALJ uses the assessment of RFC to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience.

*Arnold v. Barnhart*, 473 F.3d 816, 820-21 (7th Cir. 2007) (internal citations omitted). The claimant has the burden of proof as to the first four steps, while at step five the burden shifts to the Commissioner to show that the claimant's residual functional capacity allows her to do some work within the national economy. *Clifford*, 227 F.3d at 868.

In this case, the ALJ found that the record was unclear as to whether Burkey was engaged in substantial gainful activity but bypassed this question based on his finding that Burkey was in any case not disabled. (R. at 25.) While the ALJ found that Burkey's impairment was "severe" enough to proceed to step three of the analysis, the ALJ determined at step three that the impairment did not meet or equal any listed impairment. (*Id.*) At step four, the ALJ found that Burkey retained the residual functional capacity to perform light work and that Burkey was unable to perform any past work. (*Id.*) However, at step five, the ALJ determined that Burkey was not entitled to disability because he retained the capability to perform several jobs within the national economy that fell within the category of "light work." (*Id.*)

## C. Analysis

Burkey challenges the ALJ's decision on several grounds. First, he argues that the ALJ's determination at step three must be reversed because the ALJ failed to discuss any specific listing or give an explanation of why Burkey's impairment did not meet or equal any listing. (Pl.'s Mot. 7-8.) Second, Burkey argues that the ALJ's determination of his RFC at step four and his finding that Burkey could perform a job in the national economy at step five were patently wrong. (Pl.'s Mot. 8-13.) Third, he argues that the ALJ's determination that Burkey's testimony about his symptoms was not credible was patently wrong. (Pl.'s Mot. 13-14.) Finally, Burkey argues that the ALJ erred in refusing to allow Burkey's attorney to cross-examine the consulting expert, Dr. O'Laughlin. (Pl.'s Mot.14-16.) This Court finds that the ALJ's RFC determination, step five determination, and credibility determination were proper, but that the ALJ failed to properly articulate his reasoning at step three. Accordingly, the Court reverses and remands for further proceedings.

### 1.     The Step Three Analysis

Burkey argues that the ALJ's step three determination must be reversed because the ALJ did not specify a listing or provide any analysis or reasons as to why Burkey's condition did not meet or equal a listed impairment. In order to be upheld as supported by substantial evidence, the ALJ's decision must minimally articulate his analysis of the case; it need not discuss every piece of evidence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Simply failing to specify the applicable listing is not in itself grounds for reversal. *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004). However, the failure to specify a listing combined with a perfunctory or

superficial analysis is grounds for a remand. *Id.* at 370. Thus, the Seventh Circuit has held that a decision should be remanded to the ALJ when the ALJ's explanation is so perfunctory that it "frustrates any attempt at judicial review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

In this case, the ALJ's entire step three analysis consists of the following:

[T]he impairment has not met or medically equaled any impairment listed in Appendix 1, Subpart P, Regulations No. 4 for any 12-month period, consistent with the assessments of reviewing state agency physicians and the medical evidence before them at the time and that added to the record subsequently.

(R. at 20.)

Nowhere in this discussion does the ALJ refer to any specific listing or any of Burkey's symptoms, much less give any explanation or interpretation of the relationship between any of Burkey's symptoms and the listed impairments. Because the ALJ failed to identify any applicable listing and did not engage in any substantive analysis at all, this Court must reverse and remand.

The Commissioner argues, relying on *Rice*, that "the ALJ's failure to explicitly refer to Listing 1.04 does not necessitate reversal and remand for additional administrative proceedings." (Def.'s Resp. 9-10.) (citing *Rice*, 384 F.3d at 369-70). *Rice* is clear in its holding that the mere failure to cite a specific listing is not in itself grounds for remand, but *Rice* is equally clear that such a failure, when coupled with a perfunctory analysis, is grounds for remand. 384 F.3d at 369-70. In this case, the Court is faced with a failure to cite a specific listing coupled with a perfunctory analysis. With no discussion or explanation of the relationship between Burkey's symptoms and the listed impairments, the ALJ's opinion discloses no attempt to construct "an

accurate an logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941. It is precisely in this situation, when an ALJ's decision is so sparse as to "prevent meaningful review," that the Court is bound to remand. *Id.* at 940.

The Court rejects the Commissioner's argument that the ALJ's step three determination should be upheld notwithstanding the insufficient articulation of reasons. The Commissioner urges the Court to uphold the determination, arguing that there was no evidence to contradict the finding that Burkey's symptoms did not meet or equal a listed impairment. (Def.'s Resp. 8-10.) There is precedent[2] in this Circuit holding that, where no evidence supports the position that the claimant meets or equals a listing, an ALJ need not articulate reasons for accepting an agency determination. *See Scheck*, 357 F.3d at 700-01; *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (holding that the ALJ may "provide little additional explanation only so long as there is no contradictory evidence in the record"). Here, however, there was evidence to support Burkey's claim, a fact that the ALJ impliedly acknowledged when he found that Burkey had a "severe" impairment. (R. at 25.) Furthermore, regardless of the substantive merits of his determination, the ALJ was obligated to enable judicial review by supporting his decision with substantial evidence articulated in the decision, which he did not do. For this reason, the Court reverses and remands the ALJ's decision.

### 2. The RFC and Step Five Determinations

Burkey advances several arguments in support of his position that the ALJ's RFC and step five determinations were patently wrong. First, he argues that the ALJ erred by not performing a

---

[2] Not supplied in the Commissioner's brief.

function-by-function analysis of Burkey's residual ability to do work-related activity. (Pl.'s Mot. 8-9.) Next, he makes a variety of arguments that have in common a disagreement with the weight the ALJ attached to various pieces of evidence. The Court addresses these arguments in turn.

a.    Function-by-Function Analysis

Burkey argues that the ALJ erred by failing to perform a function-by-function analysis in determining his RFC, claiming that the ALJ simply described Burkey's limitations in terms of an ultimate exertional category. (Pl.'s Mot. 8-9.) For this reason, Burkey argues, the ALJ's determination is invalid.

The RFC is the most an individual can do in a work setting, despite any physical or mental limitations. 20 C.F.R. § 404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *3. The RFC assessment must consider an individual's remaining ability to perform each of seven exertional functions: sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-8p, 1996 WL 374184, at *5; *Qualkenbush v. Barnhart*, No. 01 C 8648, 2003 WL 22880838, at *7 (N.D. Ill. Dec. 5, 2003). In addition, an ALJ should consider an individual's capacity to perform certain nonexertional activities such as stooping, climbing, seeing, communicating, and manipulating objects. SSR 96-8p, 1996 WL 374184, at *6. Without the function-by-function assessment of an individual's mental and physical capacities, it may not be possible to determine whether that individual is capable of performing past relevant work. SSR 96-8p, 1996 WL 374184 at *3. In assessing a claimant's RFC, the ALJ

is bound to follow the standards set forth in SSR 96-8p. *Qualkenbush*, 2003 WL 22880838, at *7 (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)).

In this case, the ALJ determined that Burkey had the RFC to perform light work, which requires lifting up to twenty pounds occasionally and ten pounds frequently, as well as standing, walking, or sitting for six hours in an eight hour workday with normal breaks. (R. at 23.) In reaching this conclusion, the ALJ discussed the opinions of several physicians, including Dr. Clay Frank, Burkey's surgeon, and Dr. O'Laughlin, the consulting expert, as well as the opinions of agency physicians. (R. at 22-23.) The ALJ's opinion specifically discusses medical opinions regarding Burkey's capacity for specific functions enumerated in SSR 96-8p such as sitting, standing, walking, lifting, climbing, and an array of other physical maneuvers. (R. at 23.) In engaging in this specific discussion, the ALJ complied with the requirement of a function-by-function analysis in establishing Burkey's RFC, and this Court finds that his RFC determination was supported by substantial evidence.


        b.      Failure to Take Evidence into Account

Burkey also argues that the ALJ's RFC and step five determinations are invalid because the ALJ failed to take into account all of the evidence favorable to Burkey. Burkey argues that the ALJ failed to consider Burkey's testimony regarding post-surgical back pain and the contents

of Dr. Frank's six-month post-operative report. (Pl.'s Mot. 9-10.) He also argues that the ALJ improperly ignored testimony by the VE that was favorable to Burkey.[3] (Pl.'s Mot. 12-13.) Burkey asserts that these failures illustrate that the ALJ failed to make his decision based on all of the evidence in the record. (Pl.'s Mot. 12-13.)

This Court rejects these arguments. The record clearly indicates that the ALJ took into account Burkey's reports of suffering back pain after his back surgery as well as the contents of Dr. Frank's six-month post-operative report. The ALJ's decision explicitly discusses both of those pieces of evidence. (R. at 21, 23.) Dr. Frank's six-month report is discussed in some detail, as the ALJ noted Dr. Frank's opinions but ultimately concluded that they were not supported by specific findings and were inconsistent with other evidence on the record. (R. at 23.) While Burkey argues that Dr. Frank's opinion, as the opinion of the treating physician, was entitled to greater weight, the opinion of a treating physician is only entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *Clifford*, 227 F.2d at 870. Here, the ALJ found that Dr. Frank's opinion was not well-founded, because Dr. Frank stated that he had not performed a functional evaluation, and that it contradicted other substantial evidence. (R. at 23.) Thus, the predicates that would entitle the opinion to controlling weight were not met. The ALJ also noted Burkey's complaints but found that they were not credible. (R. at 22.) Therefore, it is not the case that the ALJ simply failed to take into account this evidence favorable to Burkey.

---

[3] Burkey also contends that the ALJ erred in his inquiry into Burkey's prior relevant work (PRW). (Pl.'s Mot.9-10.) The Court assumes that the inclusion of this argument was erroneous, as the ALJ sided with Burkey in finding that he lacked the capacity to perform any PRW. (R. at 25.)

With respect to the testimony of the VE, the ALJ asked the VE a series of hypothetical questions regarding an individual's ability to work given various sets of functional limitations. (R. at 409-11.) The third hypothetical question asked whether an individual with Burkey's background and essentially the same limitations as those prescribed by Dr. Frank would be able to perform any job in the national economy, to which the VE responded in the negative. (R. at 411.) Burkey contends that the ALJ failed to take this favorable evidence into account and that therefore his decision must be reversed. (Pl.'s Mot. 12.) However, as discussed above, the ALJ found that Dr. Frank's opinion as to Burkey's functional limitations was not credible. (R. at 23.) Therefore, the factual predicate—the existence of that set of limitations—did not exist that would make the VE's response relevant.

This Court reviews the ALJ's decision under a deferential "substantial evidence" standard and will not substitute its judgment for the ALJ's or reweigh the evidence. *See Clifford*, 227 F.3d at 869. The Court is satisfied that the ALJ's decisions on the RFC and step determinations was based on the entire administrative record and was supported by substantial evidence.

### 3. The Credibility Determination

Burkey contends that the ALJ's decision must be reversed because his determination that Burkey lacked credibility was patently wrong. Specifically, he argues that: (1) the ALJ was not specific enough in explaining his adverse credibility determination; (2) the ALJ did not take into account evidence that Burkey continued to have back pain after his surgery; and (3) the ALJ inappropriately took into account daily activities in determining that Burkey had the capacity for

- 25 -

light work. (Pl.'s Mot. 13-14.) The second argument was discussed in the preceding section of this opinion and the Court will not address it again.

An ALJ's credibility determination is a finding of fact, and, as such, is entitled to special deference from a reviewing court. *Scheck*, 357 F.3d at 703. Because the ALJ is in the best position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In this case, the Court finds that the ALJ's credibility determination was not patently wrong.

Burkey's first argument is that the ALJ was not specific enough in his reasons for determining that Burkey's testimony was not credible. SSR 96-7p requires the ALJ to specify the reasons for his credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). This Court finds that the ALJ gave sufficiently specific reasons for his credibility determination. The ALJ noted that Burkey continued to work for months after his alleged disability began in October 2001, and that he did not apply for disability until May 2002. (R. at 22.) The ALJ also noted medical opinions from both Dr. Frank and Dr. O'Laughlin that could be seen as contradicting Burkey's claims, and took into account testimony that Burkey engaged in some household and work activities. (R. at 22.) These reasons are sufficiently specific to enable review. Therefore, the ALJ's credibility determination meets the requirements of SSR 96-7p.

Burkey also argues that the ALJ improperly relied on evidence that Burkey engaged in activities such as sweeping the floor, light shopping, and possible work on a tow truck in

concluding that Burkey's testimony about his back pain was not credible. (Pl.'s Mot. 14.) Relying on *Zurawski v. Halter*, Burkey argues that this reliance is improper because "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Clifford*, 227 F.3d at 872). Here, however, the ALJ did not rely on these activities to establish that Burkey could engage in substantial activity, but merely as impeachment evidence that tended to undercut Burkey's credibility regarding his claims of disabling back pain. Consequently there was no violation of the rule in *Zurawski*.

Burkey's final attack on the credibility determination is that the ALJ erroneously stated that Burkey was working on a tow truck and that Burkey engaged in sweeping, even though Burkey testified that he had not. With respect to the sweeping, Burkey testified that he "can't even sweep the floor . . . . I tried sweeping." (R. at 377.) Therefore, the ALJ's statement that Burkey's activities included sweeping the floor appears to be erroneous. The issue of the tow truck is more ambiguous. Burkey testified that he would "go out on" a relative's tow truck once or twice a month but that he did not, and could not, do work while on the truck. (R. at 377.) However, the ALJ's decision also notes unexplained earnings of over $12,000 in the year 2002, which may undercut the credibility of Burkey's claim not to have worked. (R. at 20.)

The Court finds that the ALJ's conclusion that Burkey had worked on the tow truck was supported by substantial evidence, specifically Burkey's otherwise unexplained earnings. The Court further finds that the ALJ's conclusion that Burkey performed sweeping in his home was not supported by substantial evidence, as the only evidence in the record pertaining to sweeping is Burkey's claim that he cannot sweep. In any case, the ALJ's determination as to Burkey's

credibility was certainly not based solely or even significantly on these two factors; rather it reflects "claimant's work activity, the records from the treating surgeon, the date of the back surgery, and reports that the surgery was successful." (R. at 22.) Consequently, even if the characterization of Burkey's sweeping is erroneous, there is still specific, substantial evidence to support the ALJ's credibility determination.

### 4. Refusal to Allow Cross-Examination of Dr. O'Laughlin

In his final challenge to the ALJ's decision, Burkey argues that the ALJ erred in refusing to allow his attorney to cross-examine the consulting expert, Dr. O'Laughlin. (Pl.'s Mot. 14-15.) In cases where post-hearing evidence is introduced, the ALJ is required to inform the claimant and allow the claimant the opportunity to request a supplemental hearing. *Oyen v. Shalala*, 865 F. Supp. 497, 509 (N.D. Ill. 1994). However, the Seventh Circuit has held that cross-examination is not an absolute right in administrative cases under the Social Security Act. *See Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999) (quoting *Central Freight Lines, Inc. v. U.S.*, 669 F.2d 1063, 1068 (5th Cir. 1982)). Rather, the claimant is entitled to cross-examination only when necessary "for a full and true disclosure of the facts," as determined by the ALJ in his discretion. *Butera*, 173 F.3d at 1058 (quoting *Copeland v. Bowen*, 861 F.2d 536, 539 (9th Cir. 1988)). In this case, the Court finds that the ALJ did not abuse his discretion in denying Burkey's request to cross-examine Dr. O'Laughlin.

The ALJ provided several justifications for his decision not to allow Burkey to cross-examine Dr. O'Laughlin. First, he noted that Burkey had not provided additional medical evidence of his own, as the ALJ had requested, nor had he given a compelling reason why

- 28 -

Dr. O'Laughlin's report should be excluded. (R. at 22.) Furthermore, he indicated that cross-examination was denied because, even excluding Dr. O'Laughlin's report, the absence of subsequent medical treatment and Dr. Frank's report would have been enough to support his decision. (R. at 22.) These findings by the ALJ support the conclusion that cross-examination was not "necessary" for a "full and true disclosure of the facts." Because there was a reasonable basis for this determination, the ALJ did not abuse his discretion in denying Burkey's request for cross-examination.

## IV. Conclusion

For the reasons discussed above, the Court grants in part and denies in part Burkey's Motion to Reverse the Final Decision of the Commissioner of Social Security. The Court remands this case to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**


**MARTIN C. ASHMAN**
Dated: September 19, 2007.                    United States Magistrate Judge

Copies have been mailed to:

ASHLEY S. ROSE, Esq.
Law Offices of Ashley S. Rose
799 Roosevelt Road
Building 6, Suite 104
Glen Ellyn, IL 60137

Attorney for Plaintiff

MR. JAMES M. KUHN
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Attorney for Defendant